REYNOLDS *v.* GARBER-BUICK CO.

1. CONTRACTS—INFANTS—DISAFFIRMANCE—RESCISSION.

An infant after reaching majority may disaffirm his contract, made during infancy, for the purchase of an automobile, and tendering back the car, although it may have deteriorated with use, recover back the price which he paid for it.

2. SAME.

Where the minor told his guardian of his purpose to buy a motor car, and the guardian told him he would send enough money to enable the ward to make the first payment, as he later did, and where the seller's agent knew of the minority of the buyer, who afterwards exchanged the car for another, paying a cash difference, and the seller, after having had a conversation over the telephone with the guardian and found that the money would be advanced, made a contract in writing, evidencing the transaction, with the infant named as purchaser, it could not be held as matter of law that the contract was with the guardian.

3. GUARDIAN AND WARD—INFANTS—TRUSTS.

A guardian is a trustee of the estate of his ward, bound by law to manage and conserve it in a manner most advantageous to the inheritance, *held* as a rule, to a rigid accountability in the execution of the trust, and liable for loss occasioned by improper or unlawful expenditure of the funds.

4. SAME—POWER TO CONTRACT.

Guardians cannot by their contracts bind either the person or estate of their wards. Such contracts bind the guardian personally. Recovery must be had in an action against the guardian, not in a suit against the ward.

Error to Saginaw; Kendrick, J. Submitted October 15, 1914. (Docket No. 106.) Decided December 18, 1914.

Assumpsit by Walter Reynolds against the Garber-

Buick Company for the recovery back of money paid to the defendant. Judgment for plaintiff. Defendant brings error. Affirmed.

*Julius B. Kirby*, for appellant.

*E. L. Beach* and *Alfred F. Myer*, for appellee.

STEERE, J. Plaintiff, a young man residing in a rural neighborhood in the township of Dover, in Clare county, brought this action in Saginaw county, against defendant, a corporation located and dealing in automobiles in the city of Saginaw, for the purpose of recovering from the latter $300 paid it for a Ford automobile and $75 later paid as the difference in exchanging said Ford for a Buick runabout. The contracts of purchase and exchange for these cars were made and money paid during plaintiff's minority. On coming of age he disaffirmed the contracts, returned the Buick car, and demanded refund of the $375. His demand being refused, this action was instituted. On the trial of the case before a jury in the circuit court a verdict and judgment were rendered in his favor for $375, with interest.

It appears undisputed that defendant had knowledge at the time of these transactions that plaintiff was a minor; that plaintiff personally negotiated for the cars; and that he either personally paid to defendant, or sent it by his brother, the money sought to be recovered. In defense it is urged that the contracts were made with the knowledge and consent of, and, in legal effect, with, Richard Emerson, plaintiff's guardian, who furnished to plaintiff money to pay for the cars.

The court submitted to the jury, under instructions as to the legal relations and status of the parties, the question of whether the contracts were made with plaintiff or his guardian. This is assigned as error,

and it is urged that, under the undisputed facts, the court should have held the contract to be that of the guardian, and directed a verdict for defendant.

At the time of these transactions plaintiff was a minor, living in the country seven miles from Clare, with his brothers and sisters, on a farm rented by an elder brother. Emerson, the guardian, was a neighboring farmer who had been appointed guardian some years before, on the death of plaintiff's mother. Plaintiff left school when 16 years of age, is not shown to have pursued any calling, and apparently was not self-supporting, as he states his guardian furnished him money to keep himself—"just a little money in order to get along with"—and the guardian testified that he looked after his wants and supplied him with "necessaries and such things." The extent of his patrimony is not disclosed, but it was apparently limited; his guardian having enjoined upon him "not to get rid of any money if he could help it, for he didn't have it to spare."

Though his guardian advised to the contrary, plaintiff conceived and pursued the project of securing for himself an automobile; his reason therefore being:

"My brother had a car, and he thought I ought to have a car; that was about the size of it."

In harmony with this thought, on May 24, 1913, he and his brother journeyed to Saginaw for the purpose of investigating the opportunities there for supplying this want. The guardian knew of their mission, and furnished plaintiff $10 for expenses, but testified that he deprecated the venture, and did not know Saginaw was their objective point. They there visited defendant's garage, where they were offered a second-hand Ford car, which plaintiff finally purchased at an agreed price of $300. While negotiating he informed the salesman, Mr. Black, who made in-

quiry as to his ability to pay, that he would pay $5 down to secure the car; that he was a minor under guardianship, and on his return home would get the rest of the purchase price and send it to complete the payment. This being agreed to, a regular retail car contract for the purchase running to plaintiff was filled out and signed by him, indorsed: "Accepted. Buick Motor Company, Black, Manager." On his return home plaintiff obtained the money to make the deferred payment from his guardian, and sent his brother to Saginaw with it, who paid the balance of $295 to defendant and drove the car home for plaintiff. After using the Ford for a short time, plaintiff concluded that he preferred a Buick, and wrote defendant inquiring if he could make an exchange with them. Receiving an encouraging reply, with the suggestion that he visit Saginaw, as they had several second-hand Buicks on hand, he went to Saginaw with his Ford car, taking along an acquaintance who could drive, and on June 22, 1913, exchanged his Ford for a Buick roadster, paying $75 additional therefor. For this car he was given and signed an accepted retail car contract, as before. These negotiations were had with, and the contract was prepared by, Black, the same salesman or manager with whom he had previously dealt. Plaintiff did not have with him sufficient money to pay the additional $75 required in making the exchange. At the suggestion of Black, the guardian was reached by long-distance telephone, and consented to send the money, which he did, plaintiff receiving it the following day; the chief difference as to what occurred being whether he told plaintiff or Black that he would send it. Black put in the call for him, and testifies that when he responded:

"I said to Mr. Emerson that, 'Walter is down here, and that he has found what he says suits him in the model 14 car, and the price is $75 difference, and do

you want him to have it?' And he said, 'Yes; he may, as well have it if· it suits and he wants it.' And I said, 'Will you send the $75?' He said, 'Yes.' Then I said, 'Do you want to talk with Walter?' And he said, 'Yes; I will.' "

Of this and what led up to it Emerson testifies:

"Well, he (Walter) showed me a letter he had got from these parties before that time he came down here, and the next I heard from him was the telephone message. Mr. Black was the man that telephoned to me. He said Walter was there and wanted to talk with me.

"*Q.* Did Mr. Black tell you what Walter wanted to talk with you about?

"*A.* He wanted to talk with me about the money.

"*Q.* Did Mr. Black tell you the difference in the price of the cars?

"*A.* He did not. Walter told me over the phone. He told me there was a Buick car down there that he thought was what he wanted, and that he wanted—it was $75 difference. That is about all, generally, that he said. He asked me if I could send the money down, and I said I could. He asked me at what time, and I told him. This was on Sunday, and I told him I would send it down on the following day."

Plaintiff testified that Black did the talking over the telephone with Emerson, that he did not remember doing so, and "if I done any I done a very little of it. I am not sure whether I did or not. There was so much dickering I don't know." Ryan, the young man who accompanied plaintiff from Clare and was present when the deal was made, testified that Black put in the call for Emerson, "and he got him, and he told him Walter was down here, and Walter saw a car that he wanted, and Mr. Black asked Mr. Emerson if he wanted to talk with Walter, and he said, 'Yes;' at least Walter talked with him and asked him about money." These negotiations were had and an agreement reached on Sunday. Plaintiff then gave

Black $20, and waited at the hotel until the next day, when he received the promised money from his guardian, paid the balance on the Buick, and, with Ryan driving it, returned home.

Plaintiff became 21 years of age on July 26, 1913, and on August 4th following asserted his newly acquired manhood by disaffirming these contracts, returning the Buick, and demanding that the money he had paid be refunded. He sent the car back by his guardian, accompanied by an attorney, who, on return of the property, made proper tender and demand for plaintiff. His own testimony indicates that this guardian needed a guardian. The automobiles were not necessaries, and could scarcely be counted as luxuries to plaintiff, nor were they befitting his rank, estate, or station in life. While Black was agreeable to dealing with plaintiff, and had no hesitation in making the sales if the money was forthcoming, the views expressed by him after the Buick was returned and the contract disaffirmed were in some respects appropriate. He testifies:

"I said to Mr. Emerson: 'You ought to be arrested and sent to jail for spending this young man's funds for automobiles in this way, when he isn't fit to operate an automobile  *  *  *  new, good, second-hand, or any condition.' "

We need spend little time upon the question of plaintiff's right to recover if the contracts were independently made by and with him. After reaching his majority one may disaffirm a contract made by him during infancy and recover what he paid or parted with pursuant to such contract, if he return what he received. 22 Cyc. p. 616. And it has been held that depreciation in value of the property returned cannot even be shown to defeat or reduce recovery. On disaffirming the contract and returning the article purchased during infancy, the money paid thereon

may be recovered, though the value of its use while the infant had it may exceed the payment made upon it. *Whitcomb* v. *Joslyn*, 51 Vt. 79 (31 Am. Rep. 678).

It is undisputed that both machines were paid for by plaintiff with his own money, which his guardian furnished him, knowing it would be so used, and that Black knew he was dealing with a minor who was getting his money from his guardian for that purpose. It is idle to say the contract of purchase and sale was with Emerson. The most that can be claimed of the talk over the telephone, as Black himself relates it, is a promise by Emerson, on the Sabbath, to send plaintiff sufficient money to enable him to make the payment of $75 on the Buick, "if it suits and he wants it," and an acquiescence in, or implied approval of, the purchase, if plaintiff saw fit to consummate it. He did send the money. Had plaintiff concluded that the car did not suit him, and he did not want it, and used the money so sent him for something else, it would scarcely be contended that defendant could recover from Emerson the balance due on the purchase price of the car by reason of his fulfilled promise to send the money to plaintiff. Emerson took no part in the negotiations or selection of these cars, and never saw them until they were brought to Clare county. He and Black were strangers; they never saw each other, and he was never at defendant's place of business until after the second car was sold and delivered to plaintiff. The first communication between them was by telephone when plaintiff was negotiating a trade for the second car. All the usual transactions of purchase and sale were between plaintiff and defendant. The goods were exhibited and demonstrated to him; he was the "prospect" towards whom the salesman directed his efforts and whom he secured as a customer; plaintiff made the selection, closed the negotiations for the article purchased, paid for it, and

received delivery of it. When he wrote defendant in reference to another deal for a Buick, he was answered, in part:

"We can show you our new Buick cars. Wish to assure you, however, that any deal we make with you and take in your Ford car, we will not take advantage of you; that we will make the price right and deal with you fairly. Come down to Saginaw and see us."

Both the written contracts were with him and signed by him without reference to Emerson, and were prepared by Black, defendant's agent, with full knowledge of existing conditions. The query which directed attention to Emerson was how or where plaintiff could raise the money to pay up and perform on his part the contracts he had made with defendant. Black's evident concern was not over the fact that he was selling to a minor, but how the minor was going to get the money to pay.

Defendant's most appealing contention is that the contracts made by plaintiff while a minor, with his guardian's knowledge and consent, with funds furnished by the guardian from the ward's estate for that purpose, and which would not have been made had not the guardian promised and furnished the money, are binding upon the quondam minor, and cannot be disaffirmed by him on reaching his majority. In support of this proposition *May* v. *Webb*, Kirby (Conn.) 287, is cited with the following quotation:

"If the ward's contract is made with the guardian's consent and approbation, it is binding on him personally, as if he had made it himself."

Whether that which Emerson consented to and did and said in connection with this contract renders him liable and the contract binding on him personally is not the issue here. He is not a party to this action. The case cited does not hold that such conduct on the

part of the guardian renders the contract binding on the ward or his estate to the exclusion of his right of disaffirmance on reaching majority. That case was decided in 1787, at a time when no provision was made for an official publication of decisions by the superior court of Connecticut, and Kirby, a member of the bar, who states that he "entered upon this business in a partial manner and for private use," compiled and published the volume in which the case is found. What is there said is based upon a quoted special verdict of a jury, from which it appears that one Martha, then wife of May, had, in the years 1773 and 1774, while sole and an infant under 18 years of age, having a sufficient estate in her own right, with the consent and approbation of Ezekiel Williams, her guardian, purchased of Webb certain goods and articles, which were all necessaries, suitable to her rank and condition, and which were by Webb charged to said guardian, who afterwards refused to pay for them, whereupon, by his order and direction, they were charged to said Martha. The trial court held "that the contract, being for necessaries, might well be charged to the minor." With this view the appellate court did not agree, and is reported as saying in part:

"A contract made by a minor, under the power of a guardian, and with his consent and approbation, is by law binding upon the guardian, and was so before the revision of the statute laws of this State, in the year 1784. * * * But if such construction may not fairly be given, and the law was otherwise than is here adjudged, still, in this case, it would be that a minor, without any guardian, by the consent and approbation of said Williams, took the articles charged, and with an understanding, on the part of the creditor, that they were to be charged to Williams, and, in fact, were so charged. Therefore, on either principle, Williams was the original debtor, and no discharge given to him can operate to fix a legal claim in favor of Webb upon said Martha."

And yet the articles purchased by the infant were for necessaries.

A guardian is a trustee of the estate of his ward, bound by law to manage and conserve it in a manner most advantageous to the inheritance, and held, as a rule, to a rigid accountability in the execution of the trust, and liable for loss occasioned by improper or unlawful expenditure of the funds of his ward. He personally has no beneficial title in the ward's estate, and, even for the ward, his expenditures must be limited to those things which are necessary, beneficial, and to the advantage of the child in the line of maintenance and education according to its estate and station in life.

The infant himself, though he request it, cannot legalize a breach of this trust nor bind himself or his estate during his minority by adopting it. The doctrine of estoppel cannot be applied to his conduct during minority.

Of the power of guardians to contract for their wards, it is stated as a general proposition that:

"Guardians cannot by their contracts bind either the person or estate of their wards. Such contracts bind the guardians personally, and recovery must be had in an action against them, not against the ward." Woerner on Guardianship, p. 185.

The graphic views expressed by Black to Emerson, when the matter of disaffirmance of the contract first arose, touching the latter's disregard of his duties as guardian, indicate a fairly clear comprehension on his part of the limits of such trusteeship. With his knowledge of the disabilities of the parties and understanding of the restricted capacity in which Emerson was acting, defendant was dealing with them, through Black, at its peril. In so far as these transactions relate to depleting plaintiff's estate and his right to rescind, the principle is the same as though his

guardian had furnished him funds from his own estate in the first instance with which to purchase an automobile when and where he chose, and he, with the money to pay, had gone to defendant and made the purchase, truthfully telling whose money it was and how he came by it. Black evidently dealt with and drew up the contracts to him under the mistaken theory that an executed contract with a minor was a finality; whereas the only difference between a minor asking relief on an executed contract of purchase and resisting relief asked on an executory contract is that in the former he must make restitution and return, if possible, that which he has purchased.

This is an action at law, and the only questions which can be considered are strict legal rights. Equitable issues are not involved. The recognized policy of courts, when called upon to act in such cases, is the strict and consistent enforcement of the principle involved in the presumption that minors are incapable of obligating themselves by contract, except for necessaries, etc., as an essential means of most effectually protecting them against mischievous consequences of their own incapacity and imprudence, and impositions by those older and wiser.

It might well be urged that in submitting the case to the jury the court went further in defendant's favor than the law authorized.

The judgment is affirmed.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.